**LYNCH CARPENTER, LLP**
Todd D. Carpenter (State Bar No. 234464)
todd@lcllp.com
Scott G. Braden (State Bar No. 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Telephone:    (619)762-1910
Facsimile:    (858) 313-8150

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:    (925) 300-4455
Facsimile:    (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com

*Attorneys for Plaintiff and Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.S., individually on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HAPPY HIPPO, LLC, an Idaho limited liability company, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff L.S. ("Plaintiff")[1] brings this action on behalf of himself and all others similarly situated against defendant Happy Hippo, LLC, an Idaho limited liability company d/b/a "Happy Hippo" or "Happy Hippo Herbals" ("Defendant" or "Happy Hippo"), and Does 1 through 50, inclusive.

## I.      NATURE OF THE ACTION

1.      This is a civil class action against Defendant for false, misleading, deceptive, and negligent sales practices regarding its kratom powder, capsule, and liquid extract products (collectively, the "Products"). Kratom is a dried leaf sold as a loose powder, packaged into gel capsules, or as a liquid extract. What reasonable consumers do not know, and what Defendant fails to disclose, is that the "active ingredients" in its kratom Products are equivalent to opioids. That is, kratom interacts with the same opioid receptors in the human brain as morphine, heroin, and other opioids do, and as such, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects. When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine; they do not think of kratom or expect the "all natural" kratom product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids. Kratom is extremely addictive, and as a result, millions of unsuspecting consumers have developed kratom dependencies that have caused them serious physical, psychological, and financial harm.

2.      Here, Defendant intentionally failed to disclose these material facts regarding the dangers of kratom consumption anywhere on its Products' labeling, packaging, website, or marketing material. As a result, Defendant has violated warranty law and state consumer protection laws.

3.      Defendant relies on its Products' vague packaging and consumers' limited knowledge of kratom pharmacology to get unsuspecting users addicted to its Products and reaps profits from these addictions. Defendant relies on this ignorance and does nothing to correct it. Such activity is outrageous and is contrary to California law and public policy.

---

[1] Because this action concerns issues of addiction and medical status, Plaintiff is filing under his initials for the sake of his personal privacy. Plaintiff is a reasonable consumer who fell victim to Defendant's omissions and misrepresentations about the addictive nature of kratom, which operates like an opioid, and became addicted as a result.  Since addiction issues are still wrongly stigmatized, Plaintiff is filing this matter anonymously but will reveal his name as necessary to the Court under seal.

4.     Plaintiff seeks relief in this action individually, and as a class action, on behalf of similarly situated purchasers of Defendant's Products, for violations of: (i) California's Unfair Competition Law, Business and Professions Code Section 17200, *et seq.* (the "UCL"); (ii) California's False Advertising Law, Business and Professions Code Section 17500, *et seq.* (the "FAL"); (iii) California's Consumers Legal Remedies Act, Civil Code Section 1750, *et seq.* (the "CLRA"); (iv) breach of implied warranty; (v) unjust enrichment; and (vi) fraud by omission.

## II.     JURISDICTION AND VENUE

5.     This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiff, and at least some members of the proposed Class (defined below), have a different state citizenship from Defendant.

6.     The Eastern District of California has personal jurisdiction over Defendant because Defendant is an Idaho limited liability company or other business entity which does conduct business in the State of California and has principal executive offices located in Jurupa Valley, California. Defendant conducts sufficient business with sufficient minimum contacts in California, and/or otherwise intentionally avails itself to the California market through the sale of its kratom Products within the State of California.

7.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendant's misconduct alleged herein occurred in this District.

## III.     GENERAL ALLEGATIONS

### A.     Background and Pharmacology of Kratom

8.     "Kratom" refers to the substance derived from the leaves of a tropical tree, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century. Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium. Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

9.     Kratom is the most widely used drug in Thailand. This popularity does not mean Thailand believes kratom is harmless. To the contrary, Thailand understands that kratom is dangerous, as

demonstrated by its ban of the substance in 1943.[2] Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

10.     Kratom's varying, dose-dependent, effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

11.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

12.     To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[3]

13.     The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids." "Alkaloids" are a class of various naturally occurring organic chemical compounds. The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-hydroxymitragynine ("7-OH").

14.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain. Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

15.     Most crucially, MG and 7-OH interact with the mu-opioid receptor. The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia. For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

---

[2] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together. However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[3] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

16.     MG and 7-OH cause a variety of pharmacological effects depending on their potency, resulting in a highly dose-dependent response to each kratom product. For example, a low dose (0.5 grams to 3 grams) is typically described as stimulating or energizing, whereas a high dose (3+ grams) is typically described as euphoric, sedating, and analgesic. Nonetheless, in sufficient doses, kratom's effects are substantially similar to those of opioids and other drugs.

17.     Accordingly, kratom is referred to as a "quasi-opiate" by health professionals because of its opioid-like characteristics.  This concept that kratom is essentially an opioid is affirmed by several facts: first, as discussed above, kratom's effects are substantially similar to those of opioids; second, kratom alleviates opioid withdraw symptoms; and third, repeated use of kratom causes opioid withdrawal symptoms.

18.     Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug. The tragedy of addiction is that users want to stop but cannot.

19.     All substances that act on the opioid receptors carry a high risk of addiction, and kratom is no exception. Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had. As these doses increase, the body becomes dependent on the drug to feel normal and function properly. When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs. Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

20.     Indeed, kratom withdrawal symptoms are very similar to those of traditional opioid withdrawal. These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance, including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

21.     Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use kratom to avoid the pain and sickness of withdrawal. Use is no longer is about getting high, but about not feeling "sick."

22.     Kratom users state that kratom addiction is unique in the way it sneaks up on them. What is particularly insidious about kratom, they describe, is that because they are unaware of kratom's negative

side effects and its addictive potential, when they begin to experience the negative symptoms attributable to addiction in the early stages of taking kratom products, they do not attribute it to the kratom. Instead, kratom users then take more kratom believing the kratom companies' claims that kratom will help them feel better.

23.     Long-term kratom users further report experiencing depression, anxiety, anhedonia, and reduced sex drive due to their kratom use.

**B.     Kratom Use and Addiction in the United States**

24.     Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States. Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

25.     Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

26.     However, kratom is still generally a relatively unknown substance to the average consumer, and most people have never heard of it.  Kratom sellers advertise that it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

27.     Further, because kratom does not produce as extreme of a "high" as cocaine or heroin, it is easy for users to take kratom daily without realizing they are developing an addiction and harming themselves. This makes kratom particularly insidious as addiction sneaks up on unsuspecting and uninformed users.

28.     As a result of kratom manufacturers, retailers, and advertisers failing to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking

kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement. Further, because kratom is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid. Some kratom users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

29.     The reports from addicted kratom users are heart-wrenching. Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use. Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of October 2024:[4]

i.     **One user wrote:**

I started using kratom in pill and powder form a couple years ago. <u>I had no idea</u> it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

ii.     **Another user shared:**

I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

iii.     **Another user shared:**

I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly...  Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months

---

[4] *See* https://www.reddit.com/r/quittingkratom.

clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

30.     This Internet forum is filled with other accounts like these, and the stories are consistently the same—well-meaning people were looking to feel better by taking with what they thought was an "herbal supplement," only to develop an opioid-like addiction. This anecdotal evidence makes clear that kratom's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions. However, Defendant's Products have no information whatsoever warning that kratom is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

31.     Consumers who knew the truth about kratom may not have purchased Defendant's Products or would have paid less than they did for them.

**C.     Defendant Knew or Should Have Known it was Selling a Highly Addictive Drug to Unsuspecting Consumers**

32.     Despite kratom's traditional medical uses, the negative effects of kratom use have long been known and observed and are well-documented in Southeast Asia where the plant originates and has a long period of historic use. Kratom addiction in Thailand and Malaysia has been studied and documented in the United States by scientists and researchers since at least 1988.

33.     Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to it.

34.     Even without such interactions, Defendant received numerous user reports about the addictive potential of kratom in the United States.

35.     Defendant therefore knew or should have known that the Products it was selling were highly addictive.

36.     Despite this knowledge, Defendant failed to disclose kratom's addictive potential to its customers on its website or on its Products' packaging.

37.     To reiterate, this is not an instance where scientific merit is still up for debate. Western civilization has known for decades that kratom is highly addictive and has the potential to cause physical

and psychological dependence in regular users. In Southeast Asia, it has been known for over a century that kratom is addictive. For example, a 2007 study found that 2.3% of people in Thailand have used kratom, and that many of those users developed a dependence on kratom to avoid withdrawal.

38.    However, despite the fact that kratom's addictive potential has been known in the *scientific community*, does not mean that the general public is aware of it.  Indeed, most consumers do not know what kratom is and have no idea how addictive it is.

39.    On information and belief, Defendant imports some of its kratom Products from Thailand.[5]

40.    Defendant therefore knows or should have known that kratom users can develop an addiction. Yet, Defendant fails to disclose this material fact on its website, advertisements, or on its Products' packaging.

41.    The information provided on Defendant's Products' packaging in particular is woefully sparse. A representative image of one of Defendant's Products is depicted in the below image of Defendant's Kratom Energy Shot Product (the "Energy Shot Product"):



---

[5] *See, e.g.*, https://happyhippo.com/collections/buy-thai-kratom.

42.     On Defendant's website where it sells this Energy Shot Product, Defendant provides an ingredient list that calls the Energy Shot Product an "[e]nergy shot" and lists two active ingredients: 50mg of MG, and less than 0.02% 7-OH.[6] Additionally on this Energy Shot Product's webpage, the Product description includes subheadings titled "Clean Energy and Mental Efficiency" and "What Can You Expect?" under which Defendant boasts that its Energy Shot Product is "sugar-free," "caffeine-free," and "[e]asy to store at your desk or gym bag." This description goes even further to state "[t]hese shots are great for people who live a fast-paced, active lifestyle. Many fitness enthusiasts actually prefer our Energy Shots to the traditional caffeinated pre-workouts. The acute focus, concentration, and appetite suppression can certainly rival any pre-workout."[7]

43.     Defendant intentionally misrepresents its Products in this way to mislead consumers into thinking that kratom is a healthy, sugar-free, caffeine substitute, that is equivalent to any standard energy drink. However, as discussed above, this is not the case. Defendant goes so far as to make its logo of a smiling, pink, happy hippopotamus. The Products look like a watermelon candy more than they do a hard opioid.

---

[6] https://happyhippo.com/products/kratom-extract-kratom-energy-shot?variant=39407034138761.
[7] https://happyhippo.com/products/kratom-extract-kratom-energy-shot?variant=39402356605065.

44.     There is no warning on the Happy Hippo website or its Products' packaging to tell consumers that the Products (1) interact with opioid receptors, (2) are highly addictive, (3) should not be taken on a daily basis, and (4) result in numerous short term and long term negative side effects and withdrawal symptoms upon cessation of use. Nothing about these Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, and that function on the same mu-opioid receptors in the brain. It looks as innocuous as a vitamin supplement.

45.     There is a dropdown menu at the bottom of the Product page entitled "Kratom Use Disclaimer" that when clicked on, reveals text stating "[k]ratom may have addictive properties that can cause dependency issues. Please speak to a physician before using Kratom or any botanical compound."[8] This is the furthest Defendant goes in "warning" consumers about the usage of kratom.

46.     Also buried in a standard disclaimer at the bottom of the "Home" webpage of Defendant's website, Defendant states:

> Must be 21 years or older to purchase kratom. The FDA has not approved kratom as a dietary supplement. We do not ship to the following US states, counties, and cities where kratom is restricted: Alabama, Arkansas, Indiana, Rhode Island, Vermont, Wisconsin, Sarasota County (FL), Union County (NC), Denver (CO), and San Diego (CA). Furthermore, kratom is restricted in the following countries: Australia, Denmark, Finland, Israel, Lithuania, Malaysia, Myanmar, Poland, Romania, South Korea, Sweden, Thailand, United Kingdom, and Vietnam.[9]

This bog-standard disclaimer is a deliberately standard, uniform, and vague disclaimer one could easily find on an alcohol bottle. Defendant's disclaimer is misleading and far from the appropriate warning that consumers are entitled to, ***which should be on the physical products***.  Even if the warning were on the physical Product label, it would be woefully deficient as it does not provide any notice that kratom carries extreme addiction risks, withdrawal effects, and has health consequences.

47.     Kratom requires a far more detailed and comprehensive description warning consumers of its highly addictive nature, potential for seriously detrimental health effects, and susceptibility for withdrawal.

48.     Addiction is a disease, a medical condition.  Thus, any product which carries an addiction risk poses a concurrent health hazard, which is a material fact to consumers.  Accordingly, Defendant's

---

[8] *See, e.g.*, https://happyhippo.com/products/green-vein-borneo-kratom-powder?variant=39325192880265.
[9] *See* https://happyhippo.com/.

Products carry the threat of an an unreasonable health hazard which Defendant was obliged to disclose to consumers on its Products' packaging.

49.    Additionally, Defendant's disclaimer lacks any information on the recommended usage of the Product, which could lead unsuspecting consumers to using the Product on a daily basis, and further leading to addiction.

50.    Defendant has no excuse for its lack of a detailed disclaimer warning consumers of the kratom's harms. Kratom's addictiveness has been well-documented for decades and is an established fact in medical literature. The pharmacological effects of MG and 7-OH have been thoroughly studied, and it is well-established that MG and 7-OH act on the same mu-opioid receptors in the brain as traditional opioids do. Further, there are widespread reports and studies of other addiction and dependency issues.

51.    Reasonable consumers looking at the Products' packaging, at a smoke shop for instance, would not see this addiction "disclaimer" (not that the purported disclaimer is sufficient) or presume that kratom is highly addictive.

52.    The very fact that Defendant possesses the capability to manufacture these Products shows that it understands the pharmacokinetic nature of kratom and the substantial risk of addiction that it poses to consumers.  Despite this, Defendant markets its Products as if they are nothing more than over-the-counter energy or nootropic supplements.

53.    Indeed, with flavors like Taffy, Huckleberry, Fruit Punch, and Blood Orange, its bright pink and green package coloring, "Live Happy" slogan, "Happiness Guarantee," and ever-present smiling hippo mascot "Puddles," one could easily be confused that Defendant is marketing candy or toys to children—not a dangerously strong opioid. Much like the tobacco and vape defendants of yesteryear, unlike (most) other kratom distributors, Defendant appears to be intentionally seeking to appeal to young consumers, among others, and for adults downplaying the serious risks of addiction and withdrawal that accompany kratom use. This, combined with Defendant's colorful, happy-go-lucky website and design obfuscates the very real truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

54.    The photos below, taken directly from Defendant's website, represent a new low in advertising ethics:





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





55.     Like Plaintiff's experiences described below, consumers may walk into the local corner shop or gas station, see one of Defendant's Products with imagery like the above, and be enticed to purchase it because, they think it looks inviting and if it was dangerous there would certainly be a warning on the package.

56.     It gets worse. Just like a street-level drug dealer might do, Defendant has authorized stores, and—on information and belief—in some cases, instructed them, to give the Products out as free samples. The sample pictured below was found by Plaintiff's counsel on Defendant's website:[10]



57.     This webpage provides zero warning that the Product interacts with the *opioid* receptors, that it is addictive, or that continued use may result in severe withdrawal symptoms. The very act of giving out "free samples" is a signal to consumers that the Product is safe and harmless. Without the warning, consumers have no reason not to try the sample. They may even enjoy the effects and continue using the Product because they do not believe a Product with such substantial addictive potential would not bear some kind of warning. This is outrageous, a moral and ethical failure, and in contravention of public policy.

58.     As a kratom product seller, manufacturer and/or distributor, Defendant occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about kratom.

59.     Defendant, through its misleading advertising and its failure to disclose kratom's addictive properties on its Products' labels and webpages, relied upon the average consumer's incomplete knowledge of kratom to better sell its Products and get users addicted to its kratom Products.

60.     Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's detriment.

---

[10] *See* https://happyhippo.com/pages/free-kratom-samples.

61.     By any metric, Defendant's conduct is immoral, unethical, and contrary to California public policy.

62.     The United States is going through an opiate crisis that is shaking the foundations of our society. Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosure of its Products' risks through the use of false and misleading packaging and marketing. That cannot—and should not—be allowed, at least when Defendant's conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

## IV.     PARTIES

### A.     Plaintiff

63.     Plaintiff L.S. resides in Stockton, California. Plaintiff has been purchasing and using Happy Hippo's kratom Products for several years. He uses them on a daily basis. Plaintiff first learned about kratom and Happy Hippo approximately three years ago when he was in search of something to help him get relief from back and hip pain. Kratom was recommended to him by a smoke shop employee who never warned him of any risk of addiction, physical dependence, or withdrawals. Plaintiff also looked but did not see any warning on Happy Hippo's packaging. Plaintiff purchased Happy Hippo kratom Products most often from a smoke shop in Stockton, California. In or around 2022, his addiction and use was at its worst. He was purchasing bags of the Happy Hippo kratom powder, spending about $80.00-$90.00 per month for 500 grams at a time.

64.     During that time, Plaintiff decided he would try to take a break from it for health reasons. That is when he realized he was captive to Happy Hippo due to the bad feelings of terrible withdrawal effects he suffered, which included, but were not limited to, opiate-like withdrawals, including headaches, soreness, restless leg syndrome, cold sweats, stomach issues like diarrhea, and trouble sleeping. Despite his best efforts, to date he still has not been able to kick the habit, though he does currently take less than he previously did. Had Plaintiff known that Defendant's Happy Hippo Products were highly addictive, by way of a warning on the Products' packaging, he would have never purchased it.

### B.     Defendant

65.     Defendant Happy Hippo, LLC, is an Idaho limited liability company with its principal place of business in Jurupa Valley, California. Plaintiff is informed and believes that Defendant owns and

operates the Happy Hippo website, happyhippo.com, and that Defendant advertises, markets, distributes, and sells its Happy Hippo Products in California, including in the Eastern District of California, which has caused both the obligation and liability of Defendant to arise in this District, and throughout the United States.

66.     Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed Classes as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they are ascertained, along with appropriate charging allegations, as may be necessary.

## V.     CLASS ALLEGATIONS

67.     Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and on behalf of classes of similarly situated individuals, defined as follows:

> All persons nationwide who, within the applicable statute of limitations period, up to and including the date of final judgment in this action (the "Class Period"), purchased Happy Hippo kratom Products (the "Nationwide Class").

> All Class members in California who, within the applicable statute of limitations period, up to and including the date of final judgement in this action, purchased Happy Hippo kratom Products (the "California Class").

68.     Excluded from the Classes is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action.  Plaintiff reserves the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection with his motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

69.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Classes contain at least thousands of consumers throughout California and the United States who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff at this time.

70.   ***Existence and Predominance of Common Questions of Law and Fact***:   This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a.   whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

b.   whether Defendant knew that kratom is a highly addictive substance;

c.   whether Defendant's conduct alleged herein violated the FAL, Business and Professions Code Section 17500, the CLRA, Civil Code Section 1750, and/or the UCL, Business and Professions Code Section 17200;

d.   whether Defendant's conduct alleged herein constitutes unjust enrichment;

e.   whether Defendant's conduct constitutes a fraudulent omission;

f.   whether Plaintiff and the Classes are entitled to damages and/or restitution; and

g.   whether an injunction is necessary to prevent Defendant from continuing to sell its kratom Products without warning labels of their addictiveness.

71.   ***Typicality***: Plaintiff's claims are typical of the claims of the Classes in that Plaintiff and the Classes sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiff and all others similarly situated that Defendant's Products are highly addictive and akin to opioids.

72.   ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the members of the Classes.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Classes.

73.   ***Superiority***: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

74. Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

75. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff, Class members, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of its wrongdoing.

76. Based on the forgoing allegations, Plaintiff's claims for relief include those set forth below.

77. Plaintiff is informed that Defendant keeps extensive computerized records through its online sales data, as well as through, inter alia, general marketing programs. Defendant has one or more databases through which a significant majority of the members of the Classes may be identified and ascertained, and Defendant maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law ("UCL")**
**Business and Professions Code, §§ 17200, 17203, 17204**
***(On behalf of the California Class)***

78. Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs.

79. Plaintiff brings this cause of action individually and on behalf of the members of the proposed California Class against Defendant.

80. The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Bus. & Prof. Code, § 17200. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Bus. & Prof. Code, § 17204, *et seq*. Such a person may bring such an action on behalf of himself or herself and other similarly situated who are affected by unlawful and/or unfair business practices or acts.

81. As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by (a) representing that Defendant's Products have certain characteristics that

they do not, in violation of California Civil Code Section 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of California Civil Code Section 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that its Products pose a serious risk of addiction.

82.     Defendant's conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

83.     Defendant's conduct has injured Plaintiff and the California Class he seeks to represent in that they paid money for a Product that they would not have purchased, or paid more than they would have, but for Defendant's failure to disclose the addictive nature of its Products. Such injury substantial and is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also its omissions, consumers themselves could not have reasonably avoided such injury.

84.     Moreover, Defendant's Products pose an unreasonable health hazard because kratom is highly addictive and may induce serious withdrawal symptoms. Accordingly, Defendant had a duty to consumers to disclose on the Products' labels that their Products pose a risk of physical and psychological dependence.

85.     Pursuant to California Business and Professions Code Section 17203, Plaintiff and the California Class members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Class members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff and the California Class members' attorneys' fees and costs.

86.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

87.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and the California Class can

1   reasonably rely on Defendant's packaging, as well as those of Defendant's competitors who may have an

2   incentive to follow Defendant's deceptive practices, further misleading consumers.

3        88.    Restitution and/or injunctive relief may also be more certain, prompt, and efficient than

4   other legal remedies requested herein. The return of the full premium price, and an injunction requiring

5   Defendant to disclose on its Products' packaging that kratom is addictive will ensure that Plaintiff is in

6   the place he would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to

7   make an informed decision about the purchase of the Products absent omissions with the full purchase

8   price at their disposal.

**SECOND CAUSE OF ACTION**
**Violation of California's False Advertising Law ("FAL")**
**Business and Professions Code, § 17500, *et seq.***
**(*On behalf of the California Class*)**

12        89.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

13        90.    Plaintiff brings this claim individually and on behalf of the California Class against

14   Defendant.

15        91.    Defendant's acts and practices, as described herein, have deceived, and are likely to

16   continue to deceive, California Class members and the public at large. As described above and throughout

17   this Complaint, Defendant failed to disclose that kratom is addictive on its packaging.

18        92.    Defendant disseminated uniform advertising regarding its kratom Products to and across

19   California. This advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the

20   meaning of the FAL. Such advertisements were intended to, and likely did, deceive the consuming public

21   for the reasons detailed herein.

22        93.    The above-described false, misleading, and deceptive advertising Defendant disseminated

23   continues to have a likelihood to deceive because Defendant continues to misrepresent that kratom is not

24   addictive.

25        94.    Defendant knew, or should have known, that in making and disseminating these statements,

26   its advertisements were untrue and misleading in violation of California law. Defendant knows that kratom

27   is addictive yet fails to disclose this fact to consumers.

95.     Plaintiff and the California Class members purchased Defendant's Products based on Defendant's misrepresentations and omissions indicating that kratom is not addictive.

96.     Defendant's misrepresentations and non-disclosures of the material facts described herein constitute false and misleading advertising and, therefore, constitute a violation of the FAL.

97.     As a result of Defendant's wrongful conduct, Plaintiff and California Class members lost money in an amount to be proven at trial. Plaintiff and the California Class are therefore entitled to restitution as appropriate for this cause of action.

98.     Plaintiff and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code Civil Procedure Section 1021.5; and other appropriate equitable relief.

### THIRD CAUSE OF ACTION
### Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code, § 1750, *et seq.*
### (*On behalf of the California Class*)

99.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

100.     Plaintiff brings this claim individually and on behalf of the California Class against Defendant.

101.     Plaintiff and California Class members are consumers within the meaning of California Civil Code Section 1761(d) of the CLRA.

102.     Civil Code Section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or he does not have."

103.     Civil Code Section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

104.     Civil Code Section 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

105.     Defendant violated Civil Code Sections 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that its Products are addictive, an unreasonable health hazard and necessarily a fact which is material to reasonable consumers.

106.    Defendant's misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

107.    Defendant has exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiff or California Class members.

108.    Plaintiff and California Class members have suffered harm as a result of these violations of the CLRA, Civil Code Section 1750, because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals. As a result, Plaintiff and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory relief, and punitive damages.

109.    On October 4, 2024, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respect with Section 1782(a). The letter was sent via certified mail, return receipt requested, and advised Defendant that it was in violation of the CLRA and demanded Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom. The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty**
**(*On behalf of the Nationwide Class*)**

110.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

111.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant.

112.    Defendant, as the manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that kratom is not addictive and does not cause opioid-like withdrawal symptoms because it did not provide disclosure on the Products' packaging stating otherwise.

113.    Defendant breached its warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiff and the Nationwide Class members, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals. U.C.C. § 2-313(2)(a), (e), (f). As a result, Plaintiff and the members of the Nationwide Class did not receive the goods as impliedly warranted by Defendant to be merchantable.

114.    Plaintiff and the Nationwide Class members purchased the Products in reliance upon Defendant's skill and judgement and the implied warranties of fitness for the purpose.

115.    The kratom Products were defective when they left the exclusive control of Defendant.

116.    Plaintiff and the Nationwide Class did not receive the goods as warranted.

117.    As a direct and proximate cause of Defendant's breach of its implied warranty, Plaintiff and the Nationwide Class have been injured and harmed because (i) they would not have purchased Defendant's Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

118.    On October 4, 2024, concurrent with the filing of this action, Defendant was served with a pre-suit notice letters on behalf of Plaintiff that complied in all respects with U.C.C. Sections 2-314 and 2-607. Plaintiff's counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

### FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (*On behalf of the Nationwide Class*)

119.    Plaintiff realleges and reincorporates by reference the foregoing paragraphs of this Complaint as fully stated herein.

120.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant.

121.    Plaintiff and the Nationwide Class conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

122.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the Nationwide Class members.

123.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and the Nationwide Class members' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendant failed to disclose on the Products' packaging that the Products were addictive and similar to opioids. This caused injuries to Plaintiff and the Nationwide

Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

124.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the Nationwide Class members.

125.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

126.    Plaintiff and the Nationwide Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

127.    As a direct and proximate result of Defendant's actions, Plaintiff and the Nationwide Class members have suffered in an amount to be proven at trial.

128.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

129.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiff and members of the Nationwide Class are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

**SIXTH CAUSE OF ACTION**
**Fraud by Omission**
**(*On behalf of the Nationwide Class*)**

130.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

131.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant.

132.    Defendant distributed its Products throughout the United States, including within the State of California.

133.    Defendant misrepresented that its kratom Products had attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

134.    Defendant knows that kratom is addictive because, on information and belief, it interacts with kratom vendors and has been made aware of user reports and kratom studies. Plaintiff is further informed and believes and thereon alleges that Defendant employs specialized labs to isolate and extract kratom alkaloids for a subset of its Products.

135.    Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decisions of reasonable consumers because addiction is an unreasonable health hazard.

136.    Defendant therefore had a duty to Plaintiff and to the Nationwide Class members to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

137.    Consumers reasonably and justifiably relied on Defendant's omissions, because it is reasonable to assume that a product which is addictive like an opioid would bear a warning on its packaging.

138.    As a result of Defendant's omissions, Plaintiff and the Nationwide Class paid for kratom Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about kratom.

## VII.    PRAYER FOR RELIEF

Plaintiff, on behalf of himself and on behalf of the Classes, requests this Court award relief against Defendant as follows:

a.    an order certifying the Classes and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.    award Plaintiff and members of the Classes actual, consequential, punitive, and statutory damages, as appropriate;

c.    award restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the members of the Classes as a result of Defendant's unlawful, unfair, and fraudulent business practices described herein;

d.    award declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing its unlawful practices set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money it is required to pay;

e.     order Defendant to engage in a corrective advertising campaign;

f.     award attorneys' fees and costs; and

g.     any other further relief as the Court may deem necessary or appropriate.

### VIII.   JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 10, 2024                          **LYNCH CARPENTER, LLP**

By:   */s/Todd D. Carpenter*
Todd D. Carpenter (State Bar No. 234464)
todd@lcllp.com
Scott G. Braden (State Bar No. 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Telephone:     (619) 762-1910
Facsimile:     (858) 313-1850

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke Sironski-White (State Bar No. 348441)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:     (925) 300-4455
Facsimile:     (925) 407-2700
E-mail: ndeckant@bursor.com
            lsironski@bursor.com

*Attorneys for Plaintiff and*
*Proposed Class Counsel*